IN THE UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF FLORIDA
TAMPA DIVISION

TRACY R. ANDERSON,　　　　　　)
MAURICIO GUERRERO,　　　　　　)
SAGELINE LAURENT,　　　　　　　)
REBECCA MORALES,　　　　　　　)
STEVEN R. PEAK, and　　　　　　　)
JEFFREY S. THOMAS,　　　　　　　)
　　　　　　　　　　　　　　　　　) Case No. 8:22-cv-02941-VMC-CPT
　　　　　　　　　*Plaintiffs,*　　　)
　　　　　　　　　　　　　　　　　)
　　　　　　v.　　　　　　　　　　　)
　　　　　　　　　　　　　　　　　)
ALEJANDRO MAYORKAS,　　　　　)
Secretary,　　　　　　　　　　　　)
U.S. Dept. of Homeland Security,　　)
in his official capacity,　　　　　　)
　　　　　　　　　　　　　　　　　)
　　　　　　　　　*Defendant.*　　　)
_____ )

**COMPLAINT FOR DECLARATORY AND INJUNCTIVE RELIEF,
AND FOR MONEY DAMAGES – JURY TRIAL DEMANDED**

**PRELIMINARY STATEMENT**

1.　　In fiscal year (FY) 2018, management at U.S. Customs and

Border Protection (CBP), Area Port of Tampa, Florida, implemented a

policy for assigning CBP Officers to shifts, schedules, and work units

that was facially discriminatory on the basis of sex.

1

TPA 67808

2.      The collective-bargaining agreement between CBP and the National Treasury Employees Union (NTEU) sets forth a Bid, Rotation and Placement (BRP) process in which each fiscal year, CBP Officers are assigned to shifts, schedules, and work units according to their preferences—"bids"—and seniority. In FY2018, however, CBP management at the Area Port of Tampa unilaterally introduced sex as a factor in these assignments by designating three slots on the evening shift for female CBP Officers only.

3.      The designation of these three female-only slots directly impacted the shifts, schedules, and work units that were assigned to the Plaintiffs in this action. But for the female-only slots, Plaintiffs Mauricio Guerrero, Steven R. Peak, and Jeffrey S. Thomas would have received their first-choice bids. And Plaintiffs Tracy R. Anderson, Sageline Laurent, and Rebecca Morales were the only CBP Officers at the Area Port of Tampa in FY2018 who did not receive any of the assignments that they bid for and instead received the evening shifts reserved for females only. Not receiving the assignments that they

2

would have received based on preference and seniority alone has caused the Plaintiffs pecuniary and nonpecuniary harm.

4.     CBP Officers assigned to certain work units, including the Operations Unit and the Deferred/Review Unit where the female-only slots were designated, occasionally need to conduct patdowns or other personal searches of individuals entering the United States whom the officers reasonably suspect are breaking the law.

5.     As justification for its facially discriminatory policy, management at the Area Port of Tampa claimed that designating female-only slots on the evening shift was necessary to comply with CBP's national policies requiring female CBP Officers to conduct and witness personal searches of female passengers.

6.     Defendant Mayorkas cannot show such necessity. First, Defendant Mayorkas cannot show any special need for female CBP Officers on the evening shift, as compared to the day shift. Second, CBP's national search policies explicitly contemplate that a female CBP Officer may not be available when the need to search a female passenger arises. In such circumstances, those policies permit using a

3

non-CBP law enforcement officer or other federal agency employee to conduct the search and any other person to serve as a witness. Before management instituted female-only slots, CBP Officers at the Area Port of Tampa accomplished CBP's mission with the use of these alternatives.

7.      Because the facially discriminatory policy of designating three female-only slots on the evening shift was not necessary to accomplish CBP's mission, it violates Title VII of the Civil Rights Act of 1964, 42 U.S.C. 2000e, *et seq.* (Title VII).

## PARTIES

8.      Plaintiff Tracy R. Anderson[1] is a female CBP Officer at the Area Port of Tampa. During the FY2018 BRP cycle, she was the least senior female officer. As a result, she was placed in one of the three designated female-only slots.

---

[1] In FY2018, Plaintiff Anderson's last name was Brown. Since then, she has changed her last name to Anderson.

4

9.     Plaintiff Mauricio Guerrero is a male CBP Officer at the Area Port of Tampa. He did not receive his first-choice assignment in the FY2018 BRP process because, by the time he was placed, the only slots for that assignment that were not filled by more senior officers were reserved for female CBP Officers only.

10.     Plaintiff Sageline Laurent is a female CBP Officer at the Area Port of Tampa. During the FY2018 BRP cycle, she was the second-least senior female officer. As a result, she was placed in one of the three designated female-only slots.

11.     Plaintiff Rebecca Morales is a female who was a CBP Officer at the Area Port of Tampa during the FY2018 BRP cycle. During that cycle, she was the third-least senior female officer. As a result, she was placed in one of the three designated female-only slots.

12.     Plaintiff Steven Peak is a male who was a CBP Officer at the Area Port of Tampa during the FY2018 BRP cycle. He did not receive his first-choice assignment in the FY2018 BRP process because, by the time he was placed, the only slots for that assignment that were not

5

filled by more senior officers were reserved for female CBP Officers only.

13.     Plaintiff Jeffrey S. Thomas is a male CBP Officer at the Area Port of Tampa. He did not receive his first-choice assignment in the FY2018 BRP process because, by the time he was placed, the only slots for that assignment that were not filled by more senior officers were reserved for female CBP Officers only.

14.     Defendant Alejandro Mayorkas is the United States Secretary of Homeland Security. As such, he is the head of the department that encompasses CBP, the agency that employed Plaintiffs during the FY2018 BRP cycle and continues to employ Plaintiffs Anderson, Guerrero, Laurent, Morales, and Thomas.

## JURISDICTION AND VENUE

### Subject Matter Jurisdiction

15.     This action arises under the federal-sector provision of Title VII, 42 U.S.C. § 2000e-16. This Court has jurisdiction over the subject matter of this action pursuant to 28 U.S.C. § 1331 and 42 U.S.C. § 2000e-5(f)(3).

6

16.    Plaintiffs have filed this action within ninety days of receiving notice of final action taken by the Equal Employment Opportunity Commission (EEOC) on their consolidated complaints. The EEOC Office of Federal Operations served its final decision, dated September 26, 2022, on Plaintiffs' counsel by U.S. mail. Plaintiffs' counsel received the decision in the mail on October 3, 2022.

<u>Exhaustion of Administrative Remedies</u>

17.    Each Plaintiff contacted an EEO counselor pursuant to 29 C.F.R. § 1614.105(a) within forty-five days of when they learned of their assignments resulting from the FY2018 BRP on or about November 30, 2017.

18.    Each plaintiff then filed a formal discrimination complaint with the Department of Homeland Security (DHS) pursuant to 29 C.F.R. § 1614.106 within fifteen days of receiving notice of the right to file such a complaint from the EEO counselor.

19.    After its investigations into the complaints, DHS provided Plaintiffs with copies of the reports of investigation and notices of right to request a hearing before an EEOC Administrative Judge (AJ)

7

pursuant to 29 C.F.R. § 1614.108(f). Plaintiffs timely requested hearings under § 1614.108(h).

20.    The AJ consolidated the complaints of the Plaintiffs and two other CBP Officers. The AJ issued a decision in favor of DHS on February 15, 2022.

21.    DHS issued a final order adopting the AJ's decision on March 22, 2022. Within 30 days of that order, pursuant to 29 C.F.R. § 1614.402(a), Plaintiffs appealed to the EEOC.

22.    The EEOC Office of Federal Operations's issuance of its final decision, including its notice of the right to file a civil action, concluded the administrative proceedings.

## Venue

23.    Venue lies in the Middle District of Florida under 42 U.S.C. § 2000e-5(f)(3) because the unlawful employment practice alleged—the Area Port of Tampa's assignment of CBP Officers to shifts, schedules, and work units in FY2018 under a policy reserving three slots for females only—occurred in this district. The Tampa Division is the

8

proper division for this civil action under Local Rule 1.04 because it is the division to which the action is most directly connected.

## FACTS

### U.S. Customs and Border Protection

24.    CBP is a federal law enforcement agency within DHS that is charged with keeping terrorists and their weapons out of the United States while facilitating lawful international travel and trade.

25.    CBP Officers work within CBP's Office of Field Operations at various Ports of Entry into the United States, including land borders, airports, and seaports.

26.    The Tampa Field Office oversees the Area Port of Tampa, which encompasses Tampa International Airport and Port Tampa Bay seaport, as well as several smaller airports and seaports.

27.    The mission that CBP Officers carry out is to detect and prevent terrorists and instruments of terror from entering or exiting the United States; to enforce the laws that protect America's homeland through the detection, interdiction and apprehension of those who attempt to illegally enter or smuggle any person or contraband at the

Ports of Entry, or are found unlawfully present within their respective

jurisdiction; and to facilitate the orderly and efficient flow of legitimate

trade and lawful travelers.

28.    CBP Officers support this mission by performing inspection,

intelligence analysis, examination, and law enforcement activities

including apprehension, detention and arrest relating to arrival and

departure of persons, conveyances and merchandise at the Ports of

Entry.

<u>The Bid, Rotation, and Placement Process</u>

29.    The specific duties that a CBP Officer performs depend on

the work unit to which the CBP Officer is assigned. Work units are

specific to the configuration of each Port.

30.    At the Area Port of Tampa, in FY2018, a CBP Officer could

be assigned to one of eight work units: A-TCET/PERT (Anti-Smuggling),

Deferred/Review, Flex Unit, Logistics, Targeting, Operations (Core),

Sea Operations, or Cargo.

31.    The work unit to which a CBP Officer is assigned also

determines the location within the Area Port of Tampa where the CBP

10

Officer performs all or most of the officer's duties. The Area Port of Tampa covers various facilities across an expansive geographic area, including the Tampa International Airport, the Port Tampa Bay seaport and cruise terminal, a Centralized Examination Station near the seaport, and other, smaller airports and seaports.

32.    Each year, CBP Officers are assigned to work units according to the BRP process set forth in Article 13 of the collective-bargaining agreement between CBP and NTEU, the union that represents CBP Officers.

33.    The BRP process was designed in the interest of providing opportunities for employees to receive work assignments in accordance with their preferences, in a fair and equitable manner.

34.    Once assignments are made, employees will normally perform the work assigned for one year, until the next BRP process is conducted.

35.    CBP management may establish longer assignment durations in connection with assignments requiring specialized training.

36.   Under the BRP process, management at each port of entry determines the work units that are available for bidding and will post or distribute bid opportunity announcements describing the work unit, the assignment's duration, and any knowledge, skills, and abilities that will be used to determine if an employee is qualified for the assignment.

37.   CBP Officers wishing to bid on one or more available assignments must then submit a bid preference and qualifications form, on which they identify and self-certify their seniority and list their preferred assignments.

38.   To provide transparency in the process and ensure procedural compliance, local bid and rotation committees, consisting of at least two representatives each from NTEU and CBP management, review and process employee submissions.

39.   Although NTEU may raise concerns about the process, CBP management makes the final assignment decisions.

40.   CBP management selects qualified employees bidding for one or more assignments in seniority order, with the most senior CBP Officers processed first. A CBP Officer is placed in the officer's most

preferred assignment for which the officer is qualified, unless that assignment was filled by a more senior officer.

41.     The BRP process permits CBP Officers to bid not just for work units, but also for shifts—the hours that the officer will work in a day—and schedules—the days that the officer will work in a two-week pay period.

42.     In the Area Port of Tampa's FY2018 BRP process, each biddable assignment included a shift, schedule, and work unit.

43.     Some assignments were designated as "flex capable," meaning that the employees who received those assignments could be sent to work in other units, and others were non-flex capable.

44.     CBP management at the Area Port of Tampa delineated as many biddable assignments in FY2018 as there were CBP Officers eligible to submit bids: sixty-three.

45.     Eight of the sixty-three CBP Officers eligible to submit bids in the FY2018 BRP process were female; fifty-five were male.

13

## Management's Designation of Three Female-Only Slots

46.   In the FY2018 BRP process, for the first time, CBP management at the Area Port of Tampa reserved three of the sixty-three biddable assignments for female CBP Officers only.

47.   CBP management initially proposed six female-only assignments, three on the day shift and three on the evening shift, at an early bid and rotation committee meeting.

48.   After NTEU objected to the designation of any female-only slots, CBP management withdrew its proposal for the three female-only slots on the morning shift but kept the ones on the evening shift.

49.   As justification for designating female-only assignments, CBP management cited the CBP Office of Field Operations Personal Search Handbook, which sets forth CBP policy on when personal searches of passengers are appropriate and the procedures that CBP Officers must follow in carrying out those searches.

50.   Under the Personal Search Handbook, the need for a personal search arises when a CBP Officer has some level of suspicion

14

that a passenger entering or exiting the United States has a weapon, contraband, or evidence of a crime on or within his body.

51.   When the CBP Officer suspects that the person has a weapon, the officer may conduct an immediate patdown for the officer's safety.

52.   When the suspicion does not involve a weapon, the CBP Officer's first step is to seek supervisor approval to conduct a patdown search.

53.   A patdown search consists of patting the hands over the person's clothed body and may involve removing the person's shoes, lifting the pant leg or hem of a skirt a few inches, or removing a belt.

54.   If a patdown yields discovery of contraband or other illegal activity, the CBP Officer may seek supervisor approval to conduct a partial body search.

55.   A partial body search involves removing some of the person's clothing covering the particular area of the body where material evidence is suspected to be concealed and visually examining the

15

unclothed portion of the person's body. A CBP Officer generally may not touch the person during a partial body search.

56.    More intrusive searches than partial body searches, such as body cavity searches, require Port Director approval and consultation with the local Associate/Assistant Chief Counsel.

57.    The Personal Search Handbook states that a CBP Officer conducting any kind of personal search, except an immediate patdown for officer safety, must be of the same gender as the person being searched.

58.    The Personal Search Handbook requires a witness to be present for all personal searches, except immediate patdowns for officer safety.

59.    Like the CBP Officer conducting the search, the witness to a personal search must be of the same gender as the person being searched.

60.    Based on these policies, CBP management surmised that it needed to assign three female CBP Officers to work during the evening

shift so that two would be available to conduct and witness the search, even when the third took one of her regular days off.

61.   One of the three female-only slots was in the Deferred/Review Unit, 1400-2200, with rotating regular days off.

62.   The other two female-only slots were in the Operations Unit, 1500-2300, with rotating regular days off.

63.   According to CBP management, Operations and Deferred/Review were the work units with evening shifts in which personal searches were most likely to be performed.

64.   CBP management further justified the designation of female-only slots in the FY2018 BRP by citing data on personal searches conducted between March 10, 2016, and November 6, 2017.

65.   According to CBP management's interpretation of that data, too many of those searches violated the Personal Search Handbook's policies on who may conduct or witness the personal search of a female passenger.

66.   CBP management also reviewed the amounts paid to female CBP Officers in calendar year 2016 and calendar year 2017 for overtime

hours that they were required to work to address passenger processing issues.

67.   The overtime amounts that CBP management reviewed were not limited to amounts earned for overtime hours that female CBP Officers were required to work to conduct or witness a search of a female passenger.

68.   CBP management concluded that the amounts of overtime paid to female CBP Officers for passenger processing issues in calendar year 2016 and calendar year 2017 were unreasonably high.

<u>Facts Undercutting Management's Justification for Female-Only Slots</u>

69.   In addition to stating the basic policy that the CBP Officer conducting a personal search must be the same gender as the person being searched, the Personal Search Handbook recognizes that a CBP Officer has authority under 19 U.S.C. § 507 to engage another law enforcement officer or other federal agency employee to conduct a personal search when a CBP Officer is unavailable to do so.

70.   The Personal Search Handbook also states that a CBP Officer has authority under 19 U.S.C. § 507 to engage any another

18

person—not necessarily a law enforcement officer or federal agency employee—to act as a witness to a personal search when a CBP Officer is unavailable to do so.

71.     Under the Personal Search Handbook, CBP Officers may use their authority to engage another law enforcement officer or federal agency employee to conduct a search, or any other person to witness a search, when a CBP Officer of the same gender as the person being searched is not available. In that scenario, the Handbook states that a CBP Officer should remain immediately outside the search room to render assistance as appropriate.

72.     Pursuant to these policies in the Personal Search Handbook, before FY2018, CBP Officers used female CBP Agriculture Specialists, Transportation Security Administration (TSA) agents, and officers of local police departments, including Tampa International Airport Police, when a female CBP Officer was unavailable to search a female passenger.

73.     Before FY2018, when a female CBP Officer was unavailable to witness the search of a female passenger, CBP Officers similarly used

19

female Agriculture Specialists, TSA agents, and local police officers, as well as female airline employees.

74.    The personal search data from March 2016 to November 2017 that CBP management cited to justify designating female-only slots on the evening shift in FY2018 showed that none of the searches conducted the during the evening shift hours violated the Personal Search Handbook's policies on who may conduct or witness the personal search of a female passenger.

75.    By comparison, the data show that five searches conducted during the day shift hours violated the Personal Search Handbook's policies.

76.    The data also show that three searches conducted between 2200 and 0500, when no shifts were scheduled, violated the Personal Search Handbook's policies.

77.    Based on the overtime amounts that CBP management cited to justify designating female-only slots on the evening shift in FY2018, the eight female CBP Officers earned a total of $8,403 in calendar year 2016 for overtime hours worked to address passenger processing issues.

78.   Less than half of the $8,403 in overtime pay that the female CBP Officers earned in calendar year 2016 was for overtime work performed during the evening shift hours. The rest was for overtime work performed during the day shift hours or during hours when no shift was scheduled.

79.   CBP management's overtime figures show that the eight female CBP Officers collectively earned even less overtime pay—$5,494—in calendar year 2017 for overtime hours worked to address passenger processing issues.

80.   Again, less than half of the $5,494 in overtime pay that the female CBP Officers earned in calendar year 2017 was for overtime work performed during the evening shift hours. The rest was for overtime work performed during the day shift hours or during hours when no shift was scheduled.

81.   For perspective, according to CBP's Fiscal Year 2017 Report to Congress on CBP Officer Overtime, in each fiscal year from FY2014 to FY2017, CBP budgeted between $3 and $4 million for overtime

payments attributable to the Tampa Field Office, of which the Area Port of Tampa composes a large part.

### The Effects of the Female-Only Slots on the FY2018 BRP Results

82.    Plaintiffs Steven Peak, Jeffrey Thomas, and Mauricio Guerrero bid for evening shift assignments during the FY2018 BRP cycle, but they did not receive those assignments because of the slots reserved for females only.

83.    Plaintiff Peak ranked thirty-second out of the sixty-three total CBP Officers who were eligible to submit bids.

84.    As his first-choice bid, Plaintiff Peak listed the evening shift, 1500-2300, in the Operations Unit—the assignment for which two slots were reserved for females only.

85.    By the time Plaintiff Peak was placed, all slots for the evening shift in the Operations Unit, except for the two female-only slots, were filled by more senior officers.

86.    As a result, Plaintiff Peak received his second-choice bid: a day shift, from 0630 to 1530, in the Flex Unit, on an alternative "5/4/9" work schedule.

22

87.   Plaintiff Thomas ranked thirty-sixth out of the sixty-three total CBP Officers who were eligible to submit bids.

88.   As his first-choice bid, Plaintiff Thomas listed the evening shift, 1500-2300, in the Operations Unit—the assignment for which two slots were reserved for females only.

89.   By the time Plaintiff Thomas was placed, all slots for the evening shift in the Operations Unit, except for the two female-only slots, were filled by more senior officers.

90.   Plaintiff Thomas's second through fifth choices were also already filled by more senior officers.

91.   As a result, Plaintiff Thomas received his sixth-choice bid, a day shift, from 0730 to 1530, in the Targeting Unit.

92.   During the FY2018 BRP, Plaintiff Guerrero ranked forty-fourth out of the sixty-three total CBP Officers who were eligible to submit bids.

93.   As his first-choice bid, Plaintiff Guerrero listed the evening shift, 1200-2000, in the Deferred/Review Unit—an assignment for which one slot was reserved for a female only.

23

94.    By the time Plaintiff Guerrero was placed, all slots for that assignment, except for the female-only slot, were filled by more senior officers.

95.    Plaintiff Guerrero's second through sixth choices were also already filled by more senior officers.

96.    As a result, Plaintiff Guerrero received his seventh-choice bid: a shift from 0630 to 1530, in the Flex Unit, on an alternative "5/4/9" work schedule.

97.    None of the eight female CBP Officers wanted to work the evening shift.

98.    Plaintiffs Tracy Anderson, Sageline Laurent, and Rebecca Morales are the only CBP Officers who did not receive any of the assignments that they bid for in the FY2018 BRP cycle. They were instead placed in female-only evening shift slots.

99.    During the FY2018 BRP cycle, Plaintiff Morales ranked fifty-ninth in seniority out of the sixty-three total CBP Officers who were eligible to submit bids.

24

100.  Plaintiff Morales was the third-least senior of the eight female CBP Officers who were eligible to submit bids.

101.  As a result, Plaintiff Morales did not receive any of the assignments that she bid for.

102.  Instead, Plaintiff Morales was placed in the female-only slot on the evening shift, 1200-200, in the Deferred/Review Unit.

103.  During the FY2018 BRP cycle, Plaintiff Laurent ranked sixtieth in seniority out of the sixty-three total CBP Officers who were eligible to submit bids.

104.  Plaintiff Laurent was the second-least senior of the eight female CBP Officers eligible to submit bids.

105.  As a result, Plaintiff Laurent did not receive any of the five assignments that she bid for.

106.  Instead, Plaintiff Laurent was placed in one of the two designated female-only slots on the evening shift, 1500-2300, in the Operations Unit.

107.  As her first-choice bid, Plaintiff Laurent listed the day shift in the Targeting Unit, the assignment that Plaintiff Thomas received.

25

108.  But for the female-only slots, Plaintiff Thomas would have gotten his first-choice assignment, leaving his slot on the day shift in the Targeting Unit open for Plaintiff Laurent to fill.

109.  During the FY2018 BRP cycle, Plaintiff Anderson ranked sixty-second in seniority out of the sixty-three total CBP Officers eligible to submit bids.

110.  Plaintiff Anderson was the least senior of the eight female CBP Officers eligible to submit bids.

111.  As a result, Plaintiff Anderson did not receive any of the six assignments that she bid for.

112.  Instead, Plaintiff Anderson was placed in one of the two designated female-only slots on the evening shift in the Operations Unit.

<u>The Harm Suffered by Plaintiffs</u>

113.  Plaintiff Anderson suffered pecuniary and nonpecuniary harm because of her placement in one of the female-only slots.

114.  Plaintiff Anderson viewed CBP management's use of sex as a factor in assigning her to the evening shift in the Operations Unit as

unfair and discriminatory. Experiencing such unfairness and discrimination caused Plaintiff Anderson emotional pain and mental anguish.

115. Unlike working in any of the other units except the Flex Unit, working in the Operations Unit does not qualify a CBP Officer for any specialized training.

116. Ineligible for any specialized training, Plaintiff Anderson could not develop the experience or qualifications that improve a CBP Officer's chances of receiving a promotion or a special assignment to the National Training Center or CBP Headquarters.

117. CBP management at the Area Port of Tampa has continued to designate female-only slots in the FY2019, FY2020, FY2021, and FY2022 BRP cycles.

118. Since FY2018, the Area Port of Tampa has hired only one more female CBP Officer.

119. At least one female CBP Officer who participated in the FY2018 BRP process, however, has since changed positions and no longer participates in the BRP process.

27

120.   So, since FY2018, Plaintiff Anderson has continued to rank among the lower-seniority female CBP Officers at the Area Port of Tampa who are placed in the female-only slots, regardless of their preferences.

121.   In every fiscal year since FY2018, Plaintiff Anderson has been assigned to a female-only slot on the evening shift in the Operations Unit. For the reasons noted above, there is a real risk that this will continue in future fiscal years.

122.   Plaintiff Anderson, therefore, has lost opportunities to broaden her experience and improve her chances of career advancement. And it is reasonable to expect this unfortunate pattern to continue in future fiscal years.

123.   Meanwhile, men who rank lower in seniority than Plaintiff Anderson have received assignments that they bid for and that Plaintiff Anderson would like to have received.

124.   Watching these lower-seniority men gain the experiences that she would have liked to gain has heightened Plaintiff Anderson's

28

feelings of injustice and, correspondingly, has increased her emotional pain and mental anguish.

125. Plaintiff Guerrero suffered pecuniary and nonpecuniary harm because of CBP management's designation of female-only slots in the FY2018 BRP process.

126. Plaintiff Guerrero was denied his first-choice assignment on the evening shift in the Deferred/Review Unit because the only remaining slot for that assignment was reserved for a female CBP Officer only.

127. Plaintiff Guerrero has worked as a CBP Officer at different locations since 2005.

128. From 2011 to 2015, Plaintiff Guerrero worked at CBP's preclearance station in Toronto, Canada.

129. While on this assignment in Toronto, Plaintiff Guerrero gained experience, knowledge, and skills related to determining individuals' admissibility into the United States and processing immigration cases.

130.  At the Area Port of Tampa, Deferred/Review is the work unit charged with determining individuals' admissibility into the United States and processing immigration cases.

131.  Since moving to the Area Port of Tampa in 2015—until FY2018—Plaintiff Guerrero bid for and received assignments on the evening shift in the Deferred/Review Unit.

132.  When he worked the evening shift, he was entitled to fifteen percent night differential under 19 U.S.C. § 267.

133.  Until FY2018, Plaintiff Guerrero and his family organized their lives around his working the evening shift: his wife started work early in the morning, and he would take his two young children to daycare and school.

134.  In FY2018, Plaintiff Guerrero was assigned to a shift from 0630 to 1530, in the Flex Unit.

135.  Because he worked the day shift in FY2018, Plaintiff Guerrero could no longer take the children to daycare and school. So, his wife quit her job.

136. Plaintiff Guerrero's wife looked for part-time work that could contribute income to the family without interfering with their children's needs, but she never found a suitable job.

137. Because he was assigned to a day shift in FY2018, Plaintiff Guerrero was not entitled to the night differential pay that he received in previous years.

138. Without this night differential, and without his wife's income, Plaintiff Guerrero and his family suffered financial losses.

139. Working in the Flex Unit, Plaintiff Guerrero could not employ his experience, knowledge, and skills related to determining individuals' admissibility into the United States or processing immigration cases. Thus, he took less pride in his work.

140. Knowing that CBP management assigned a CBP Officer to the Deferred/Review Unit based on her sex, not based on experience, knowledge, and skills related to admissibility review, made Plaintiff Guerrero feel like CBP management did not appreciate his unique skillset.

31

141.   Plaintiff Laurent suffered pecuniary and nonpecuniary harm because of her placement in one of the female-only slots on the evening shift.

142.   Plaintiff Laurent has young children. Working the evening shift has cost her considerable time with her children since FY2018.

143.   Because of working the evening shift, Plaintiff Laurent has missed her children's after-school activities, like basketball games and football games, since FY2018.

144.   Because Plaintiff Laurent's shift ends at 2300, her children are often asleep when she gets home from work. The only time that she can spend with them is the roughly one-hour period between when she wakes up in the morning and when her children leave for school.

145.   One of Plaintiff Laurent's young children has developed behavioral issues that Plaintiff Laurent attributes to not being home when the child needs her.

146.   Plaintiff Laurent's parents have moved in with her to help with childcare and household tasks, adding to her household expenses.

147.   Missing so much time with her children—time that she can never get back—has caused Plaintiff Laurent emotional pain and mental anguish.

148.   Plaintiff Laurent has been placed in a female-only slot on the evening shift every fiscal year since FY2018. Given the staffing pool and her seniority level, it is reasonable to expect that this will continue in future fiscal years.

149.   Plaintiff Laurent would like to experience working in other units but cannot because, as one of the lowest-seniority female CBP Officers at the Area Port of Tampa, she is repeatedly needed to fill a female-only slot in the Operations Unit. For the reasons noted above, there is a real risk that this will continue in future fiscal years.

150.   Meanwhile, men who rank lower in seniority than Plaintiff Laurent have received assignments that they bid for and that Plaintiff Laurent would like to have received.

151.   Watching these lower-seniority men gain the experiences that she would have liked to gain has increased Plaintiff Laurent's emotional pain and mental anguish.

33

152. Plaintiff Morales has suffered pecuniary and nonpecuniary harm because of her placement in one of the female-only slots on the evening shift.

153. Plaintiff Morales has children who were school age in FY2018.

154. Plaintiff Morales's husband is also a CBP Officer.

155. Before FY2018, Plaintiff Morales and her husband worked opposite shifts—she worked during the day, and he worked in the evening—so that one parent could take the children to school, and the other could pick them up.

156. When Plaintiff Morales was assigned to the evening shift in FY2018, the family had to hire a private care provider to care for the children after school, causing a financial burden.

157. One of Plaintiff Morales's children began to struggle in school, which Plaintiff Morales attributes to the family disruption caused by her assignment to the evening shift.

158. Working the evening shift, Plaintiff Morales was able to spend very little time with her children.

34

159. Not being able to spend time with her children caused Plaintiff Morales emotional pain and mental anguish.

160. Because of the family disruption caused by Plaintiff Morales's assignment to the evening shift, she and her husband argued a lot. Her relationship with her husband suffered.

161. Plaintiff Morales was assigned to a female-only slot on the evening shift from FY2018 until August 2022, when she accepted a new position as an intelligence officer with CBP.

162. During that time, Plaintiff Morales would have liked to experience working in other units but could not because she was repeatedly needed to fill a female-only slot.

163. In her new position, Plaintiff Morales no longer receives assignments based on the BRP process.

164. Plaintiff Morales applied for her new position because she did not want to be stuck in a female-only slot anymore.

165. Plaintiff Peak suffered pecuniary and nonpecuniary harm because of CBP management's designation of female-only slots in the FY2018 BRP process.

166.  Before FY2018, Plaintiff Peak worked the evening shift for many years.

167.  When he worked the evening shift, Plaintiff Peak was entitled to fifteen percent night differential under 19 U.S.C. § 267(b).

168.  When he was assigned to the day shift in FY2018, Plaintiff Peak no longer earned fifteen percent night differential.

169.  Because of the family's schedules, when Plaintiff Peak was assigned to the day shift in FY2018, his wife had to switch to a different job. Her new job paid less than her previous job.

170.  In FY2018, Plaintiff Peak's son attended a private school with no bus service. When Plaintiff Peak worked the evening shift, he took his son to school. When he was assigned to the day shift in FY2018, the family paid $20 per day for a taxi service to take his son to and from school.

171.  In FY2018, Plaintiff Peak was his eighty-five-year-old mother's only caretaker. When he was assigned to the day shift, he had to pay someone to check in on his mother twice per week.

36

172.  Not being able to check in on or spend time with his elderly mother caused Plaintiff Peak stress and emotional pain.

173.  Plaintiff Thomas suffered pecuniary and nonpecuniary harm because of CBP management's designation of female-only slots in the FY2018 BRP process.

174.  Because Plaintiff Thomas was assigned to the day shift, he did not receive the fifteen percent night differential that he would have been entitled to under 19 U.S.C. § 267(b) if he received his first-choice bid for an evening shift in the Operations Unit.

175.  Plaintiff Thomas preferred to work the evening shift because those hours were more convenient for his family.

176.  Plaintiff Thomas's wife worked long hours during the day.

177.  Plaintiff Thomas has school-age children.

178.  As a result of being assigned to the day shift, Plaintiff Thomas's family incurred childcare costs.

179.  Assigned to the Targeting Unit, Plaintiff Thomas worked at a location farther from his home than where he would have worked if he received his first-choice assignment in the Operations Unit.

37

180.  Because of his longer commute to work, Plaintiff Thomas incurred expenses for gas that he would not have incurred if he had received his first-choice assignment.

## CAUSE OF ACTION

<u>Disparate Treatment Sex Discrimination in Violation of Title VII</u>

181.  Plaintiffs restate the allegations in the above paragraphs as though fully stated herein.

182.  Title VII prohibits discrimination on the basis of sex.

183.  CBP management's designation of three female-only slots on the evening shift in the FY2018 BRP process is facially discriminatory on the basis of sex.

184.  The facially discriminatory policy caused a material change to Plaintiff Guerrero, Plaintiff Peak, and Plaintiff Thomas's compensation.

185.  The facially discriminatory policy caused a material change in all Plaintiffs' terms, conditions, or privileges of employment.

186.  A facially discriminatory policy violates Title VII unless the defendant employer can establish that sex is a "bona fide occupational

qualification (BFOQ) reasonably necessary to the normal operation of that particular business or enterprise." 42 U.S.C. § 2000e-2(e)(1).

187.   The BFOQ exception is "an extremely narrow exception to the general prohibition of discrimination on the basis of sex." *Dothard v. Rawlinson*, 433 U.S. 321, 334 (1977).

188.   Under the BFOQ exception, "sex based discrimination is valid only if the essence of the business would be undermined" without the discriminatory policy. *Hardin v. Stynchcomb*, 691 F.3d 1364, 1370 (11th Cir. 1982) (citing *Diaz v. Pan American World Airways, Inc.*, 442 F.3d 835, 388 (5th Cir. 1971), *cert. denied*, 404 U.S. 950 (1971)).

189.   Defendant Mayorkas cannot satisfy his burden of proving the BFOQ exception.

190.   Because the designation of female-only slots in the FY2018 BRP process is a facially discriminatory policy that cannot be justified under the BFOQ exception, it violates Title VII.

## REQUEST FOR RELIEF

WHEREFORE, Plaintiffs request judgment as follows:

A.    Declaring that the designation of female-only slots in the FY2018 BRP process at the Area Port of Tampa violated Title VII.

B.    Awarding Plaintiffs back pay and compensatory damages in amounts to be proven at trial.

C.    Enjoining Defendant Mayorkas or his subordinates from continuing to designate female-only slots in any future BRP process at the Area Port of Tampa without demonstrating a bona fide occupational qualification.

D.    Awarding Plaintiffs reasonable attorney fees and costs incurred in this action.

E.    Ordering such further relief as the Court may deem just and appropriate.

Respectfully submitted,

JULIE M. WILSON
General Counsel

PARAS N. SHAH
Deputy General Counsel

WILLIAM LI
Associate General Counsel for General Law

/s/ Jessica Horne
JESSICA HORNE*
Assistant Counsel
*Lead Counsel


NATIONAL TREASURY EMPLOYEES UNION
800 K Street, NW
Suite 1000
Washington, DC 20001
(202) 572-5500
julie.wilson@nteu.org
paras.shah@nteu.org
william.li@nteu.org
jessica.horne@nteu.org

Counsel for Plaintiffs

41