UNITED STATES DISTRICT COURT
MIDDLE DISTRICT OF FLORIDA
TAMPA DIVISION

TRACY R. ANDERSON,
MAURICIO GUERRERO,
SAGELINE LAURENT,
REBECCA MORALES,
and JEFFREY S. THOMAS,

     Plaintiffs,

v.                  Case No. 8:22-cv-2941-VMC-CPT

ALEJANDRO MAYORKAS,
Secretary, U.S. Dep't of
Homeland Security,
in his official capacity,

     Defendant.
_____/

## SEALED ORDER

This matter comes before the Court pursuant to Defendant Alejandro Mayorkas's Sealed Motion for Summary Judgment (Doc. # 51) and Plaintiffs Tracy R. Anderson, Mauricio Guerrero, Sageline Laurent, Rebecca Morales, and Jeffrey S. Thomas's Sealed Motion for Partial Summary Judgment on Liability and Injunctive Relief (Doc. # 52), both filed on March 5, 2024. Both sides have responded (Doc. ## 53, 54), and replied. (Doc. ## 55, 56). For the reasons that follow, Defendant's Motion is denied, and Plaintiffs' Motion is denied.

I.    **Background**

The parties mostly agree as to the facts.

The primary mission of Customs and Border Protection ("CBP") is to detect and prevent terrorists and instruments of terror from entering or exiting the United States; to enforce the laws that protect America's homeland through the detection, interdiction, and apprehension of those who attempt to illegally enter or smuggle any person or contraband through ports of entry or are found to be present unlawfully; and to facilitate the orderly and efficient flow of legitimate trade and lawful travelers. (Def. Ex. 1 at 1).

Customs and Border Protection Officers ("CBPOs") are federal law enforcement officers who work for CBP. A core responsibility of a CBPO is to perform personal searches of travelers who are suspected of carrying or concealing merchandise or contraband into the United States. (Id. at 1; Test. of Robert Diaz, Def. Ex. 2 at 42:12-18). That said, personal searches are not an everyday occurrence. According to Plaintiff Rebecca Morales, she "performed only about two patdown searches per year." (Pl. Ex. 13 at 1); see also (Pl. Ex. 11 at 3) (Plaintiff Sageline Laurent declaring that she "cannot remember the last time [she] did a patdown").

CBPOs receive (a) law enforcement training at the Federal Law Enforcement Academy, (b) firearms training, (c) instruction on less-than-lethal tactics or intermediate force devices, and (d) CBP personal search training. (Def. Ex. 1 at 3, 5, 8; Test. of Tracy Brown, Def. Ex. 3 at 254:19-255:4; Test. of Kenneth Wetzel, Def. Ex. 3 at 186:25-187:5; 190:14-191:10).

CBPOs must annually recertify their skills to conduct personal searches. (Wetzel, Def. Ex. 3 at 186:19-187:5). CBPOs are required to rapidly react to potential threats, including through the controlled use of force where necessary and potentially through the use of deadly force. (Def. Ex. 1 at 2). CBPOs can be sent on a temporary duty assignment or "TDY" to high-need areas around the country such as the southern border. A TDY can last weeks or months. (Diaz, Def. Ex. 2 at 133:2-6; see Brown, Def. Ex. 3 at 254:2-5; 270:4-25).

CBPOs are represented nationally by the National Treasury Employees Union ("NTEU"). CBP and the NTEU enter a collective bargaining agreement ("CBA") every few years. During the Fiscal year 2018 ("FY2018") yearly Bid, Rotation and Placement ("BRP") process, the CBA was being revised and

the 2013 contract was in effect. Article 13 covered Bid, Rotation and Placement. (Def. Ex. 4).

CBP faces the same challenges as law enforcement agencies nationally in recruiting female candidates and is committed to recruiting more female candidates. (Wetzel, Def. Ex. 3 at 197:18–199:11).

### A.   CBP Searches Generally

CBP operations include 9 types of searches. They are — from least to most intrusive, generally speaking — immediate patdown for officer safety, patdown (or personal search), partial body search, x-ray voluntary, x-ray involuntary, body cavity voluntary, body cavity involuntary, monitored bowel movement initial, and monitored bowel movement over 8 hours. No supervisory approval is required for an immediate search for officer safety, but the others require various levels of supervisory approval. (Def. Ex. 5 at 50).

The CBP's Personal Search Handbook includes officer instructions for each type of search as well as flowcharts, supervisory approval information, a check sheet, worksheet, consent forms, and reporting requirements. (Def. Ex. 5).

Immediate patdowns for officer safety are not aimed at uncovering evidence of a crime. Immediate patdowns for officer safety may be conducted by and witnessed by CBPOs of

the opposite sex than the traveler. (Id. at 6, 15). No witness is required for an immediate patdown. (Pl. Ex. 5 at 6).

**B.  Personal Searches in Particular**

There are seven primary categories CBPOs use to determine whether to conduct a personal search: behavioral analysis, observational techniques, inconsistencies, intelligence, K-9 alerts, searches conducted incident to an adverse action related to a seizure, arrest or inadmissibility/deportability of an alien, or officer safety. (Def. Ex. 5 at 2-3; Def. Ex. 6, Decl. of Robert B. Diaz at ¶ 10). The need for a personal search can arise at a moment's notice. (Def. Ex. 6 at ¶ 10).

During a personal search, a CBPO touches and checks an individual from head to toe, working down one side systematically, back up, down the other side, and back up. It should involve multiple groin checks. For female travelers, normally female CBPOs pull the bra out to ensure nothing is in that area. Personal searches are done over the clothing. (Wetzel, Def. Ex. 3 at 187:6-118; Diaz, Def. Ex. 2 at 40:15-41:13).

A personal search may include: (1) patting hands over the person's clothed body; (2) removing shoes; (3) lifting the pant leg or hem or skirt a few inches; (4) removing a

Case 8:22-cv-02941-VMC-CPT   Document 59 *SEALED*   Filed 05/22/24   Page 6 of 33 PageID 2072

belt; (5) examining or reaching into pockets; (6) rolling up shirtsleeves; and (7) removing a wig or hairpiece. (Def. Ex. 5 at 16-17). A personal search can progress to a more invasive search depending on the articulable facts that unfold. (Wetzel, Def. Ex. 3 at 191:11-192:5; Def. Ex. 5 at 50). Progressing to a more invasive search requires supervisory approval. (Def. Ex. 5 at 16).

CBPO search policy requires men to conduct and witness personal searches of men, and women to conduct and witness personal searches of women. (Id. at 6).

One role of a witness is to observe and act as a safety officer. In the event that the person being searched becomes combative, the witness can react. (Wetzel, Def. Ex. 3 at 189:16-191:10). The Personal Search Handbook states that another CBPO should be used as a witness unless they are "unavailable," which is not specifically defined. (Def. Ex. 5 at 6-7; Diaz, Def. Ex. 2 at 126:12-15; Wetzel, Def. Ex. 3 at 204:15-205:11). Still, it is clear that a CBPO is considered unavailable to conduct or witness a personal search if there is a "difference in gender" between the CBPO who is available and the person being searched. (Def. Ex. 5 at 7).

When CBPOs are not available, the Personal Search Handbook requires another law enforcement officer or federal agency employee to conduct the search but allows any other person to serve as the witness. (Id. at 6-7). Indeed, CBPOs "have the authority to demand the assistance of any person in making any arrest, search, or seizure authorized by any law enforced or administered by customs officers, if such assistance may be necessary." 19 U.S.C. § 507(b). The Personal Search Handbook states to "[u]se this authority *only* when another CBP Officer is unavailable as a witness and *only* after giving explicit instructions to the person who will act as a witness." (Def. Ex. 5 at 7) (emphasis in original).

While law enforcement officer witnesses are "responsible for assisting . . . should any safety measures be necessary," non-law enforcement officer witnesses are "not to intervene in any physical altercation that may occur." (Id.). Rather, "a CBP officer will remain immediately outside the search room to render assistance as appropriate." (Id.).

The Personal Search Handbook was updated in 2021 and now includes new requirements for personal searches involving gender identity and declared gender. (Def. Ex. 7 at 25,47-48, App. H; Wetzel, Def. Ex. 3 at 211:22-212:15).

C. **CBP Agriculture Specialists**

CBP Agriculture Specialists ("CBPAS") are experts in importation and exportation of plants, plant products, and agricultural commodities. Among other responsibilities, they seek to prevent introduction of harmful pests, diseases, and potential agro-terrorism. (Def. Ex. 8 at 1).

CBPASs are not law enforcement officers, do not carry firearms, and are not trained in intermediate force techniques or personal searches. (Diaz, Def. Ex. 2 at 42:19-43:11; Def. Ex. 8). A CBPAS asked to witness a search is instructed not to engage should the traveler become combative, but to call for help. They are not to assist in any way. (Wetzel, Def. Ex. 3 at 193:17-194:6; Def. Ex. 5 at 7).

D. **Area Port of Tampa**

The Area Port of Tampa extends from Tampa east to Lakeland, and south to Naples. It includes Tampa International Airport, six smaller airports, and two seaports. (Diaz, Def. Ex. 2 at 17:17-18:4).

During FY2018 in the Area Port of Tampa, 8 of 63 CBPOs were female and about half of international travelers were female. (Id. at 18:11-19:8; Def. Ex. 9).

Case 8:22-cv-02941-VMC-CPT   Document 59 *SEALED*   Filed 05/22/24   Page 9 of 33 PageID 2075

Passenger processing routinely occurred from 7:00 AM until 10:00 PM at the Area Port of Tampa in FY2018. (Def. Ex. 6 at ¶ 10). Cruise ships typically arrive into the Area Port of Tampa only between 7:00 AM and 9:00 AM while flights arrive later in the day. (Diaz, Def. Ex. 2 at 46:7-48:15; 110:3-11: 29). In the Area Port of Tampa, CBPOs bid for both bid units (or work units) and schedules as part of the BRP. (Def. Ex. 10; Def. Ex. 11; Def. Ex. 4 at 32-47).

A "bid" refers to an individual's request to be assigned to a specific work unit, available shift, and schedule. (Def. Ex. 4 at 32). A "work unit" is the smallest organizational component, operational or equivalent level to which groups of employees are normally assigned and for which qualifications for positions are defined and applied. Such units are specific to the configuration of each Port. (Id. at 34). In FY2018, CBPO bid units in the Area Port of Tampa were A-TCET/PERT Unit (anti-smuggling), Cargo Unit, Deferred/Review Unit, Flex Unit, Logistics Unit, Operations (Core) Unit, Sea Operations Unit, and Targeting Unit. (Def. Ex. 10; Def. Ex. 11).

Each year, CBP management conducts a BRP. Management provides NTEU with advance copies of bid opportunities announcements for work units associated with localized

functions. NTEU provides issues or concerns regarding the announcements to management. (Def. Ex. 4 at 35-36).

### E.   Assistant Area Port Director Robert Diaz

In 2017, Robert Diaz was promoted to Assistant Area Port Director for Passenger Operations for the Area Port of Tampa. He had previously served as a supervisor at Port Canaveral. (Diaz, Def. Ex. 2 at 17:6-16).

To prepare for the FY2018 BRP, Diaz reviewed current and future projected workload in the Area Port of Tampa, including scheduled flights and cruises as well as the types of seizures that had been occurring. (Id. at 19:16-20:16). Diaz reviewed the Search Arrest and Seizure ("SAS") system where CBP recorded positive inspection results such as when CBP found prohibited material such as narcotics, prescription medications, and merchandise. (Id. at 20:17-21:16).

Diaz noticed a trend in SAS that when CBPOs found prohibited materials, such as from a canine alert, "we were seizing the merchandise but we were not performing the personal search on that individual in many of the instances." (Id. at 22:2-19). Diaz testified that "there was a lot more, a lot of female inspections where there was no personal search performed[,] where we seized [merchandise] where no personal search was performed." (Id.).

Case 8:22-cv-02941-VMC-CPT  Document 81  Filed 07/17/24  Page 11 of 33 PageID 2993
Case 8:22-cv-02941-VMC-CPT  Document 59 *SEALED*  Filed 05/22/24  Page 11 of 33
PageID 2077

Plaintiffs dispute Diaz's conclusion that failures to perform personal searches occurred more when the passenger was female. They point out that more than half of the incidents in which something was seized but no personal search was performed involved male passengers. (Pl. Ex. 8 at 2-26). For FY16, the SAS data includes ▮ incidents in which a patdown of a female passenger was required. (Id. at Pl.2144-45). For ▮ of those incidents, a patdown was not performed on the female passengers. (Id.). Likewise, in FY16, there were ▮ incidents involving male passengers in which a patdown was required. (Pl. Ex. 9 at DEFT. RFT RESP. 1339-40). In ▮ of those incidents, no patdown was performed on the male passengers. (Id.). For FY17, there were ▮ incidents involving female passengers in which a patdown was required. (Pl. Ex. 8 at Pl.2146-52). For ▮ of those incidents, no patdown was performed on the female passengers. (Id.). Also, for FY17, there were ▮ incidents involving male passengers in which a patdown was required. (Pl. Ex. 9 at DEFT. RFT RESP. 1337-38). For ▮ of those incidents, no patdown was performed on the male passengers. (Id.).

"IOIL" refers to the incident operations incident log which is housed within the Treasury Enforcement

11

Communications System ("TECS"). (Wetzel, Def. Ex. 3 at 195:12-196:3; Def. Ex. 5 at 5, 10-11).

Diaz reviewed the "IOIL," where CBP records incidents including negative personal searches, meaning the CBPO received approval for a personal search, but the search outcome was negative. (Diaz, Def. Ex. 2 at 21:17-22:1). Diaz noticed in IOIL that, in his opinion, CBP was not following its personal search policies. He noted instances of opposite gender individuals witnessing searches, or non-CBPO individuals performing or witnessing personal searches. In other instances, searches were categorized as immediate pat-downs for officer safety, but the narratives did not support it. (Id. at 22:20-24:4). Diaz was shocked by his review of the data. (Id. at 24:5-10).

Diaz prepared charts of the personal searches on female travelers during his review of the SAS and IOIL systems for his own use at the time. (Id. at 24:16-25:10). The first chart Diaz prepared shows female positive searches, arrests, and seizures, meaning events in which CBP either arrested an individual or found prohibited material on them which was seized. He noted instances where searches were not witnessed, were witnessed by individuals other than CBPOs, or when

Case 8:22-cv-02941-VMC-CPT Document 81 Filed 07/17/24 Page 13 of 33 PageID 2995
Case 8:22-cv-02941-VMC-CPT Document 59 *SEALED* Filed 05/22/24 Page 13 of 33
PageID 2079

searches should have been conducted but were not. (Id. at
25:18-31:8; Def. Ex. 12).

The second chart Diaz prepared listed incidents from the
IOIL. He noted instances where male CBPOs were performing a
personal search on females that was against policy. Digging
further into the issue, Diaz discovered that, in his opinion,
many searches had been misclassified as immediate patdowns
(which males can perform on females) instead of normal
patdowns (which males cannot perform and which require
supervisory approval). Diaz observed that in many instances
when this occurred, there were no female CBPOs on site. (Diaz,
Def. Ex. 2 at 30:2-31:8; Def. Ex 13).

Plaintiffs dispute Diaz's characterization of the number
of misclassified patdowns as "a lot." They note that in Fiscal
year 2016 ("FY16"), Diaz or other managers determined that
▇▇▇▇ patdowns were misclassified as immediate, while in
Fiscal year 2017 ("FY17"), that number was only ▇▇. (Pl. Ex.
10 at Pl.2127-28).

Diaz also prepared a third chart summarizing female CBPO
overtime. Red entries showed overtime when there were no
shifts and black entries showed overtime during normal
business hours. Diaz realized the Area Port of Tampa was

Case 8:22-cv-02941-VMC-CPT   Document 81   Filed 07/17/24   Page 14 of 33 PageID 2996
Case 8:22-cv-02941-VMC-CPT   Document 59 *SEALED*   Filed 05/22/24   Page 14 of 33
PageID 2080

spending overtime for normal operations. (Diaz, Def. Ex. 2 at 32:12-33:15; Def. Ex. 14).

Nevertheless, the cost of overtime for female CBPOs who worked between 14:00 and 23:00 to conduct or witness searches of female travelers in FY16 and FY17 was low. The amount for FY16 was $854.18 and for FY17 was $503.72. (Pl. Ex. 6 at 10). For each of these two years, this category of overtime for female CBPOs was less than 0.15% of the Area Port of Tampa's overall overtime expenditures. (Id. at 10, 16).

Diaz attempted to find the minimum number of female positions that would accomplish CBP's mission. He considered the various areas of operation and scheduling needs. Management initially determined that there should be three designated female-only slots in the daytime and three in the evening. (Diaz, Def. Ex. 2 at 46:7-48:15).

According to Diaz, he designated female-only slots because he determined that CBP was not fulfilling its enforcement mission by not conducting or improperly conducting personal searches of female travelers. (Def. Ex. 6 at ¶¶ 17-18; Diaz, Def. Ex. 2 at 136:24-137:2-10). Diaz considered the lack of female CBPOs to be a vulnerability for CBP and a failure to fulfill its enforcement mission. (Diaz, Def. Ex. 2 at 136:24-140:17).

Case 8:22-cv-02941-VMC-CPT   Document 81   Filed 07/17/24   Page 15 of 33 PageID 2997
Case 8:22-cv-02941-VMC-CPT   Document 59 *SEALED*   Filed 05/22/24   Page 15 of 33
PageID 2081

**F.   Meetings Between Management and NTEU**

Consistent with the CBA, CBP management met regularly with NTEU about the FY2018 BRP starting in July 2017 and discussed the female-only slots at some of those meetings. (Id. at 45:5-46:6; Def. Ex. 15 Aff. of Daniel Nieto at ¶¶ 8-10). Management sent NTEU the proposed units and work descriptions on October 2, 2017, consistent with the agreed-upon timeline between CBP and NTEU. (Def. Ex. 6 at ¶ 16; Def. Ex. 16).

Management and NTEU discussed several options in lieu of designating female-only slots. Management proposed rotating all female CBPOs through the Passenger Operations Unit. NTEU proposed utilizing the Transportation Security Administration ("TSA"), Tampa Police Department, requesting assistance from CBPAS, or relying on female supervisory CBPOs to assist in searches of female passengers. (Diaz, Def. Ex. 2 at 135:17-136:12; Def. Ex. 3 at 164:17-23; Brown, Def. Ex. 3, 227:3-11; Def. Ex. 15 at ¶ 14).

Management did not consider utilizing overtime for female CBPOs because management believed it has an obligation to minimize overtime. (Diaz, Def. Ex. 2 at 32:12-33:7).

The original staffing and schedules that were posted to CBP personnel on October 31, 2017, had six female-only slots

Case 8:22-cv-02941-VMC-CPT  Document 59 *SEALED*  Filed 05/22/24  Page 16 of 33
PageID 2082

and employees submitted bid preferences based on that information. The six slots included three designated female slots during the day shift (two in the Flex Unit and one in the A-TCET unit) as well as three designed female slots in the afternoon/evening (two in Passenger Operations and one in the Deferred Inspections/Review Unit). (Id. at 46:7-48:15; Def. Ex. 3 at 172:6-13; Def. Ex. 10).

The Area Port of Tampa clarified by email that "CBPOs [were] not precluded from bidding to any desired/shift unit based on gender. Slots designated as requiring a female officer to ensure agency policy can be carried out as the need arises (e.g., patdowns), may be filled in reverse seniority order if volunteers are not received through bid submissions." (Def. Ex. 17).

Around November 17, 2017, Diaz reduced the number of female-designated slots from six to three. The female-designated slots were reduced from six to three because during the day, female CBPOs can be called from other locations to perform personal searches of female passengers at the airport. For example, female CBPOs working in the cargo area could be directed to assist with a personal search at the airport. (Def. Ex 18; Diaz, Def. Ex. 2 at 50:10-52:1; 121:24-122:4; 122:12-22).

While only two female CBPOs are required to conduct and witness a search, designating three was to allow for days off, leave, and TDYs to ensure that two female CBPOs would be available. (Diaz, Def. Ex. 2 at 46:7-15).

On November 17, 2017, Diaz and local NTEU President Daniel Nieto reviewed CBPO bid preferences and conducted the placement. CBPOs were placed into bid units predominately in seniority order except for three female CBPOs who were placed into Operations (Core) and Deferred Inspections on the evening shift in reverse seniority order. (Def. Ex. 6 at ¶¶ 16, 19-21; Diaz, Def. Ex. 2 at 56:17-25; Def. Ex. 18; Def. Ex. 19 (showing Plaintiffs Morales, Laurent, and Anderson at 61, 62, and 65 of 66, respectively); Def. Ex. 15 at ¶ 2). The BRP results were circulated to the Area Port of Tampa CBPOs on November 30, 2017. (Def. Ex. 11).

Since FY18, CBP management at the Port of Tampa has continued to designate certain assignments as female-only every fiscal year through FY24. (Pl. Ex. 6 at 18; Pl. Ex. 9 at DEFT. RFP RESP. 0649, 0926; Pl. Ex. 11 at 1).

Plaintiffs maintain that they have exhausted their administrative remedies. (Pl. Ex. 18 at Pl.3100-01; Pl. Exs. 19-23). Defendant, for his part, asserts that Plaintiffs have only exhausted administrative remedies as to female-

Case 8:22-cv-02941-VMC-CPT   Document 81   Filed 07/17/24   Page 18 of 33 PageID 3000
Case 8:22-cv-02941-VMC-CPT   Document 59 *SEALED*   Filed 05/22/24   Page 18 of 33
PageID 2084

designated slots in FY18. See (Def. Ex. H at 4) ("I am filing
a formal complaint against the Area Port of Tampa Office of
Field Operations Port Director Radames A. Torres due to
actions taken by him during the 2018 Bid and Rotation
Placement for the Port of Tampa."); (Def. Ex. I at 3, ¶ 15.E)
("Discriminatory and unfair FY2018 bid rotation unit
selections based only on gender (female)."); (Def. Ex. J at
4) ("The Area Port Tampa implemented Specific Bid assignments
for FY 2018 based solely on gender."); (Def. Ex. K at 4)
(complaining that "[o]n November 11, 2017, The Area Port of
Tampa, implemented specific bid assignments for FY 2018 based
solely on gender (Female Slots)"); (Def. Ex. L at 7)
(complaining that CBP "implemented its 2018 bid and rotation
assignments with dedicated slots for female officers only").

### G.   Plaintiffs

Sixty-three CBPOs participated/submitted bids for
preferred work units and schedules in the FY2018 BRP. Fifty-
five were male and eight were female. (IF pp. 147, 151-155).

Plaintiff Jeffrey Thomas was 36/63 in biddable
seniority. As his first-choice bid, Thomas listed the night
shift, 15:00-23:00, in the Operations Unit — the assignment
for which two slots were reserved for females only. (Pl. Ex.
1 at ¶ 88; Pl. Ex. 2 at ¶ 88). He received his fifth bid

Case 8:22-cv-02941-VMC-CPT   Document 59 *SEALED*   Filed 05/22/24   Page 19 of 33
PageID 2085

choice and was placed in Targeting from 7:30-15:30. (Def. Ex. 9 at 3; Def. Ex. 11).

Plaintiff Mauricio Guerrero, a male, was 44/63 in biddable seniority. As his first-choice bid, Guerrero listed the night shift, 14:00-22:00, in the Deferred/Review Unit — the assignment for which one female-only slot was reserved. (Pl. Ex. 1 at ¶ 92; Pl. Ex. 2 at ¶ 92). He received his seventh bid choice and was assigned to the Flex unit from 6:30-15:30. (Def. Ex. 9 at 3; Def. Ex. 11).

Plaintiff Rebecca Morales was 59/63 in biddable seniority and was the third-least senior female CBPO. Morales only bid for assignments on the day shift. (Pl. Ex. 9 at DEFT. RFP RESP. 1387). She was placed in Deferred/Review from 14:00-22:00 in a female-only slot. (Def. Ex. 9 at 4; Def. Ex. 11). When Morales was working the night shift in a female-only assignment in FY18, she could not be with her children after school. (Pl. Ex. 13 at 2). As a result, her family spent thousands of dollars on childcare in 2018. (Id.).

Plaintiff Sageline Laurent was 60/63 in biddable seniority and was the second-least senior female CBPO. As her first-choice bid, Laurent listed a morning shift, 07:30-15:30, in the Targeting Unit. (Pl. Ex. 9 at DEFT. RFP RESP.

Case 8:22-cv-02941-VMC-CPT   Document 81   Filed 07/17/24   Page 20 of 33 PageID 3002
Case 8:22-cv-02941-VMC-CPT   Document 59 *SEALED*   Filed 05/22/24   Page 20 of 33
PageID 2086

1375). She was placed in Operations (Core) from 15:00-23:00 in a female-only slot. (Def. Ex. 9 at 4; Def. Ex. 11).

Plaintiff Tracy Anderson was 62/63 in biddable seniority and was the least senior female CBPO. Anderson did not receive any of the assignments she bid for. Instead, she was placed in Operations (Core) from 15:00-23:00 in a female-only slot. (Def. Ex. 9 at 4; Def. Ex. 11).

### H.   Procedural History

Plaintiffs initiated this action on December 27, 2022, asserting a claim for disparate treatment sex discrimination under Title VII of the Civil Rights Act. (Doc. # 1). Defendant filed his answer on March 15, 2023. (Doc. # 15). The case then proceeded through discovery.

Now, both sides move for summary judgment as to liability. (Doc. ## 51, 52). Both sides have responded (Doc. ## 53, 54), and have replied. (Doc. ## 55, 56). The Motions are now ripe for review.

## II.   Legal Standard

Summary judgment is appropriate "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). A factual dispute alone is not enough to defeat a properly pled motion for summary judgment; only the

Case 8:22-cv-02941-VMC-CPT   Document 81   Filed 07/17/24   Page 21 of 33 PageID 3003
Case 8:22-cv-02941-VMC-CPT   Document 59 *SEALED*   Filed 05/22/24   Page 21 of 33
PageID 2087

existence of a genuine issue of material fact will preclude a grant of summary judgment. Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 247-48 (1986).

An issue is genuine if the evidence is such that a reasonable jury could return a verdict for the non-moving party. Mize v. Jefferson City Bd. of Educ., 93 F.3d 739, 742 (11th Cir. 1996) (citing Hairston v. Gainesville Sun Publ'g Co., 9 F.3d 913, 918 (11th Cir. 1993)). A fact is material if it may affect the outcome of the suit under the governing law. Allen v. Tyson Foods, Inc., 121 F.3d 642, 646 (11th Cir. 1997). The moving party bears the initial burden of showing the court, by reference to materials on file, that there are no genuine issues of material fact that should be decided at trial. Hickson Corp. v. N. Crossarm Co., 357 F.3d 1256, 1260 (11th Cir. 2004) (citing Celotex Corp. v. Catrett, 477 U.S. 317, 323 (1986)). "When a moving party has discharged its burden, the non-moving party must then 'go beyond the pleadings,' and by its own affidavits, or by 'depositions, answers to interrogatories, and admissions on file,' designate specific facts showing that there is a genuine issue for trial." Jeffery v. Sarasota White Sox, Inc., 64 F.3d 590, 593-94 (11th Cir. 1995) (quoting Celotex Corp., 477 U.S. at 324).

Case 8:22-cv-02941-VMC-CPT   Document 81   Filed 07/17/24   Page 22 of 33 PageID 3004
Case 8:22-cv-02941-VMC-CPT   Document 59 *SEALED*   Filed 05/22/24   Page 22 of 33
PageID 2088

If there is a conflict between the parties' allegations or evidence, the non-moving party's evidence is presumed to be true, and all reasonable inferences must be drawn in the non-moving party's favor. Shotz v. City of Plantation, 344 F.3d 1161, 1164 (11th Cir. 2003). If a reasonable fact finder evaluating the evidence could draw more than one inference from the facts, and if that inference introduces a genuine issue of material fact, the court should not grant summary judgment. Samples ex rel. Samples v. City of Atlanta, 846 F.2d 1328, 1330 (11th Cir. 1988). But, if the non-movant's response consists of nothing "more than a repetition of his conclusional allegations," summary judgment is not only proper, but required. Morris v. Ross, 663 F.2d 1032, 1034 (11th Cir. 1981).

Finally, the filing of cross-motions for summary judgment does not give rise to any presumption that no genuine issues of material fact exist. Rather, "[c]ross-motions must be considered separately, as each movant bears the burden of establishing that no genuine issue of material fact exists and that it is entitled to judgment as a matter of law." Shaw Constructors v. ICF Kaiser Eng'rs, Inc., 395 F.3d 533, 538-39 (5th Cir. 2004); see also United States v. Oakley, 744 F.2d 1553, 1555 (11th Cir. 1984) ("Cross-motions for summary

22

judgment will not, in themselves, warrant the court in granting summary judgment unless one of the parties is entitled to judgment as a matter of law on facts that are not genuinely disputed . . . ." (quotation omitted)).

## III. **Analysis**

### A.   **Defendant's Motion**

There is no dispute that the CBP's decision in Fiscal Year 2018 to designate three female-only slots at Tampa International Airport was facially discriminatory.[1] However, Defendant maintains that he should succeed on the affirmative defense that sex is a *bona fide* occupational qualification ("BFOQ").

Under Title VII, it is "an unlawful employment practice for an employer . . . to discharge any individual, or otherwise to discriminate against any individual with respect

---

[1] The Court agrees with Defendant that Plaintiffs have only exhausted their administrative remedies as to FY18. (Doc. # 54 at 8-9). "Before bringing a Title VII action in court, a federal employee must first seek relief from the agency where the alleged discrimination occurred." Ramirez v. Sec'y, U.S. Dep't of Transp., 686 F.3d 1239, 1243 (11th Cir. 2012). The relevant "regulations provide, *inter alia,* that an aggrieved employee must 'initiate contact with [an EEO] Counselor within 45 days of the date of the matter alleged to be discriminatory....'" Id. (quoting 29 C.F.R. § 1614.105(a)(1)). Plaintiffs' formal complaints to EEO counselors relate to the FY18 female-only slots. (Def. Exs. H-L). Thus, the Court will only address whether the assignment of three female-only slots in FY18 was a BFOQ.

Case 8:22-cv-02941-VMC-CPT   Document 81   Filed 07/17/24   Page 24 of 33 PageID 3006
Case 8:22-cv-02941-VMC-CPT   Document 59 *SEALED*   Filed 05/22/24   Page 24 of 33
PageID 2090

to [her] compensation, terms, conditions, or privileges of employment, because of such individual's . . . sex." 42 U.S.C. § 2000e-2(a)(1). However, "an employer may discriminate on the basis of . . . sex . . . in those certain instances where . . . sex . . . is a bona fide occupational qualification reasonably necessary to the normal operation of that particular business or enterprise." Int'l Union, United Auto., Aerospace & Agr. Implement Workers of Am., UAW v. Johnson Controls, Inc., 499 U.S. 187, 200 (1991) (quoting 42 U.S.C. § 2000e-2(e)). The BFOQ exception recognizes that "classifications based on . . . sex . . . may sometimes serve as a necessary proxy for [a] neutral [job] qualification[] essential to the employer's business." W. Air Lines, Inc. v. Criswell, 472 U.S. 400, 411 (1985).

"The BFOQ defense has been construed very narrowly to apply 'only when the *essence* of the business operation would be undermined by not hiring members of one sex exclusively.'" Garrett v. Okaloosa Cnty., 734 F.2d 621, 624 (11th Cir. 1984) (quoting Diaz v. Pan Am. World Airways, 442 F.2d 385, 388 (5th Cir. 1971)); see also Int'l Union, United Auto., Aerospace & Agr. Implement Workers of Am., UAW, 499 U.S. at 201 ("The BFOQ defense is written narrowly, and this Court has read it narrowly."). "At bottom, to establish a BFOQ

24

Case 8:22-cv-02941-VMC-CPT   Document 59 *SEALED*   Filed 05/22/24   Page 25 of 33 PageID 2091

defense, the Defendant must satisfy two elements. The Defendant must show that: (1) the sex-based qualification sufficiently 'relate[s] to [the] ability to perform [a] dut[y] of the job,' and (2) the particular duty goes to the essence of the Defendant's business." Berry v. Great Am. Dream Inc., 88 F. Supp. 3d 1378, 1380 (N.D. Ga. 2015) (quoting Int'l Union, United Auto., Aerospace & Agr. Implement Workers of Am., UAW, 499 U.S. at 204)).

Here, a genuine dispute of material fact exists as to whether sex is a BFOQ for purposes of the relevant sex-discriminatory policy of designating female-only slots in FY18.

True, the parties agree that only females should conduct and witness searches of female passengers (and males conduct/witness searches of male passengers) to protect the privacy interests of passengers. See (Doc. # 51 at 19) ("Here, the Parties agree that only females should be performing and witnessing personal searches of female passengers."); (Doc. # 53 at 1) ("For purposes of this case, Plaintiffs assume that this requirement [that females perform and witness searches of females] is justified."). Thus, a basis in fact exists for Defendant's policy in FY18 of designating three female-only spots at Tampa International Airport to ensure

Case 8:22-cv-02941-VMC-CPT   Document 81   Filed 07/17/24   Page 26 of 33 PageID 3008
Case 8:22-cv-02941-VMC-CPT   Document 59 *SEALED*   Filed 05/22/24   Page 26 of 33
PageID 2092

that female CBPOs were available to conduct searches of female passengers. See Wade v. Napolitano, No. 3-07-0892, 2009 WL 9071049, at *10 (M.D. Tenn. Mar. 24, 2009) ("Plaintiff does not dispute a need for female screeners to conduct invasive pat-down searches of female passengers. Accordingly, the Court concludes that Defendant has satisfied that a basis in fact exists for TSA's policy of requiring at least 33% of its screener positions to be women.").

Also, the Court agrees with Defendant that the essence of the CBP's business is "securing the border," which includes "conducting personal searches of individuals entering the country who are suspected of carrying contraband." (Doc. # 54 at 6); see also Int'l Union, United Auto., Aerospace & Agr. Implement Workers of Am., UAW, 499 U.S. at 203 (explaining that the "essence" is the "central mission of the employer's business"); Wade, 2009 WL 9071049, at *10 (finding that "TSA's essence or central mission" is "providing security at the nation's airports"). As the EEOC has previously held regarding the CBP, the CBP's "mission involves national security and the operation of an international airport's port of entry." Stephany A. v. Nielsen, EEOC DOC 0120151021, 2018 WL 2085985, at *7 (Apr. 25, 2018). "The essence of the employer's business is processing passengers and baggage for

Case 8:22-cv-02941-VMC-CPT   Document 81   Filed 07/17/24   Page 27 of 33 PageID 3009
Case 8:22-cv-02941-VMC-CPT   Document 59 *SEALED*   Filed 05/22/24   Page 27 of 33
PageID 2093

national security purposes." Id. "Performing the task of screening same-sex passengers is essential to the employer's business and public safety." Id.; see also Mirzayans v. Chertoff, EEOC DOC 0120040649, 2007 WL 313372, at *5 (Jan. 23, 2007) ("[T]he [Administrative Judge ("AJ")] found that the agency had established that a core responsibility of customs inspectors was to perform personal searches of passengers passing through the airport to locate concealed merchandise or contraband. The passengers' privacy interests 'in avoiding intrusive physical searches by opposite-sex inspectors' justified the sex-based assignments 'as the privacy concerns involved the essence of the Agency's business.' We agree with the AJ's finding in this respect.").

Still, the BFOQ defense "does not excuse investigation of and reliance upon alternatives that involve minor additional costs or inconveniences." Henry v. Milwaukee Cnty., 539 F.3d 573, 582 (7th Cir. 2008). Thus, the Court next inquires as to whether there were reasonable alternatives to Defendant's designation of three female-only slots for CBPOs on the night shift in FY18. See Stephany A., 2018 WL 2085985, at *6 (Apr. 25, 2018) ("A finding of discrimination would be appropriate if the employer failed to show that its sex-based restrictions were required as a

business necessity and that there was no reasonable alternative with a less discriminatory impact."); Mirzayans, 2007 WL 313372, at *6 ("The question remains as to whether it was necessary for the agency to assign two male and two female customs inspectors to every passenger processing team in order to effectuate the protection of the passengers' privacy interests, or whether reasonable alternatives existed."). "A 'staffing restriction . . . must match . . . "job functions" with a high degree of specificity to be found reasonably necessary.'" Ambat v. City & Cnty. of San Francisco, 757 F.3d 1017, 1030 (9th Cir. 2014) (quoting Breiner v. Nevada Dep't of Corr., 610 F.3d 1202, 1213 (9th Cir. 2010)).

According to Defendant, "because the Parties agree that females must perform and witness personal searches of female passengers, there can be [no] alternatives that are non-discriminatory, because any solution must specifically provide for females to conduct and witness searches." (Doc. # 51 at 23). It also emphasizes that CBP management and NTEU discussed several options in lieu of designating female-only slots. Management proposed rotating all female CBPOs through the Passenger Operations Unit. (Def. Ex. 2 at 135:17-136:12). NTEU proposed utilizing the TSA and Tampa Police Department, requesting assistance from CBPASs, or relying on female

supervisory CBPOs to assist in searches of female passengers.
(Def. Ex. 3 at 164:17-23, 227:3-11).

Additionally, Defendant highlights that the CBP reduced
the number of female-only slots to the fewest spots believed
necessary. Originally, Diaz was planning on designating six
female-only slots (three during the day and three in the
evening). (Diaz, Def. Ex. 2 at 46:7-48:15). After further
review, Diaz concluded that female CBPOs assigned to other
locations or duties could be called over to conduct personal
searches at the airport during the day shift. Thus, Diaz
reduced the number of female-only slots to three during the
evening shift at the airport. (Def. Ex 18; Diaz, Def. Ex. 2
at  50:10-52:1;  121:24-122:4;  122:12-22).  Given  this,
Defendant maintains that the three female-only slots that
were created were reasonably necessary.

Plaintiffs, on the other hand, insist that there were
reasonable alternatives with a less discriminatory impact.
According to Plaintiffs, "[b]ecause the data show that the
problem of patdowns not being performed when required was not
gender-specific, gender-neutral measures like educating CBPOs
on when patdowns are required should have been evaluated."
(Doc. # 53 at 16-17). "And because the problem of
misclassified patdowns practically disappeared by FY17, port

Case 8:22-cv-02941-VMC-CPT   Document 81   Filed 07/17/24   Page 30 of 33 PageID 3012
Case 8:22-cv-02941-VMC-CPT   Document 59 *SEALED*   Filed 05/22/24   Page 30 of 33
PageID 2096

management should have reflected on what happened to resolve the issue and implemented more of the same." (Id. at 17).

The Court is unpersuaded that more training was a solution to the problem of needing female CBPOs to conduct searches of female passengers at the airport at night. As Defendant puts it, "[n]o amount of training can make female CBPOs available to conduct and witness personal searches during the evening shift if those CBPOs have not been scheduled to work that shift." (Doc. # 56 at 4).

Nevertheless, Plaintiffs' other alternatives are more persuasive. Plaintiffs next argue that Defendant had options including "occasionally seeking assistance from female non-CBPOs, as the Personal Search Handbook instructs." (Doc. # 53 at 17). They highlight that "in FY16 and FY17 combined, only ███ non-immediate patdowns of females between 14:00 and 23:00 involved male CBPOs, and only ███ involved non-CBPOs." (Id.; Pl. Ex. 8 at Pl.2144-45; Pl. Ex. 10 at Pl.2127-28). While Plaintiffs acknowledge that the use of female non-CBPOs or male CBPOs during searches of females is not "ideal," Plaintiffs maintain that "[d]esignating female-only assignments on the night shift was too extraordinary a measure to address a relatively isolated issue." (Doc. # 53 at 17); see also Ambat, 757 F.3d at 1031 ("A discriminatory employment

policy is an extraordinary response to a workplace problem."). Basically, Plaintiffs believe that the occasional use of a non-CBPO law enforcement agent to conduct or witness a search of a female passenger — as allowed by CBP's own handbook — was more reasonable than designating female-only slots on the night shift.

Finally, Plaintiffs argue that the CBP could have paid overtime to female CBPOs who it would call in to perform or witness patdowns of female passengers between 2:00 PM and 11:00 PM on the rare occasions that such a need arose. (Doc. # 52 at 26–28). Plaintiffs highlight the negligible amount of money spent on overtime pay for female CBPOs for overtime worked to conduct or witness searches of female passengers between 14:00 and 23:00 in FY2016 and FY2017: $854.18 in FY2016 and $503.72 in FY2017. (Pl. Ex. 6 at 10). Notably, these amounts are less than 0.15% of Area Port of Tampa's overall overtime expenditures in those years. (Id. at 10, 16).

Thus, the expense of overtime for female CBPOs to come in to conduct or witness searches on the night shift was minimal. In light of that, Plaintiffs maintain that "instituting female-only assignments was a drastic — and discriminatory — measure for a vanishingly small benefit" in

reduced overtime pay. (Doc. # 52 at 28). While Defendant argues that the overtime option is "unworkable due to the time delay in calling female CBPOs in from wherever they are outside of work hours," Defendant has not cited any record evidence to support that contention. (Doc. # 56 at 4).

Considering the factual disputes over the viability of non-CBPOs conducting or witnessing searches and of utilizing overtime as alternatives to designating female-only slots in FY2018, the Court cannot determine on summary judgment whether the relevant policy was or was not a BFOQ as a matter of law. "The BFOQ defense inherently raises factual issues." Hernandez v. Univ. of St. Thomas, 793 F. Supp. 214, 217 (D. Minn. 1992). "[D]etermining the 'reasonableness' of various alternatives is most properly done after a trial, so that the cost concerns, and other factors may be analyzed in light of Title VII's fundamental goal of eradicating employment discrimination." E.E.O.C. v. Sedita, 816 F. Supp. 1291, 1298 (N.D. Ill. 1993). Given these factual disputes and the narrowness of the BFOQ defense, Defendant's Motion is denied.

**B.   Plaintiffs' Motion**

The same factual disputes that require denial of Defendant's Motion likewise require denial of Plaintiffs' Motion.

Case 8:22-cv-02941-VMC-CPT   Document 81   Filed 07/17/24   Page 33 of 33 PageID 3015
Case 8:22-cv-02941-VMC-CPT   Document 59 *SEALED*   Filed 05/22/24   Page 33 of 33
PageID 2099

Accordingly, it is now

**ORDERED, ADJUDGED,** and **DECREED:**

(1)   Defendant Alejandro Mayorkas's Sealed Motion for Summary Judgment (Doc. # 51) is **DENIED.**

(2)   Plaintiffs Tracy R. Anderson, Mauricio Guerrero, Sageline Laurent, Rebecca Morales, and Jeffrey S. Thomas's Sealed Motion for Partial Summary Judgment on Liability and Injunctive Relief (Doc. # 52) is **DENIED.**

**DONE** and **ORDERED** in Chambers in Tampa, Florida, this 22nd day of May, 2024.

VIRGINIA M. HERNANDEZ COVINGTON
UNITED STATES DISTRICT JUDGE