UNITED STATES DISTRICT COURT
MIDDLE DISTRICT OF FLORIDA
TAMPA DIVISION

TRACY R. ANDERSON,
MAURICIO GUERRERO,
SAGELINE LAURENT,
REBECCA MORALES,
and JEFFREY S. THOMAS,

    Plaintiffs,

v.                               Case No. 8:22-cv-2941-VMC-CPT

ALEJANDRO MAYORKAS,
Secretary, U.S. Dep't of
Homeland Security,
in his official capacity,

    Defendant.
_____/

**ORDER**

This matter comes before the Court pursuant to Plaintiffs Tracy R. Anderson, Mauricio Guerrero, Sageline Laurent, Rebecca Morales, and Jeffrey S. Thomas's Motion for Judgment as a Matter of Law and Renewed Motion for Judgment as a Matter of Law under Rule 50(b). (Doc. ## 100, 113). Defendant Alejandro Mayorkas responded on January 10, 2025. (Doc. # 114). For the reasons that follow, the Motions are denied.

**I. Background**

The Court and the parties are familiar with the facts of this case and so the Court will not repeat them in detail.

1

Suffice it to say, this is a Title VII sex discrimination case brought by Plaintiffs, three female and two male U.S. Customs and Border Protection Officers ("CBPOs"), against Defendant, the Secretary of the Department of Homeland Security. The case revolves around three female-only night shift assignments at the Tampa Airport in Fiscal Year 2018.

Throughout the case, Defendant asserted a bona fide occupational qualification (BFOQ) defense, contending that gender-based assignments were reasonably necessary to the Port of Tampa's operations. Specifically, Defendant maintained that scheduling three female CBPOs on the night shift was reasonably necessary to ensure that one female CBPO would be available to conduct personal searches of female travelers as needed and one female CBPO would be available to witness those personal searches consistent with CBP's policy and legal requirements.

The case proceeded through discovery. The Court denied the parties' motions for summary judgment on May 22, 2024, finding that Defendant's BFOQ affirmative defense must be decided by the jury. (Doc. # 59).

A jury trial was held from November 18 to November 22, 2024. (Doc. ## 97-99, 101, 104). The jury verdict was in favor of Defendant. The jury found that Plaintiffs had established

2

their prima facie case, but that Defendant had established its BFOQ affirmative defense. (Doc. # 106).

During trial, Plaintiffs filed a Motion for Judgment as a Matter of Law (Doc. # 100), on which the Court deferred ruling. After trial, Plaintiffs filed a Renewed Motion for Judgment as a Matter of Law under Rule 50(b). (Doc. # 113). Defendant has responded (Doc. # 114), and the Motions are ripe for review.

## II. Legal Standard

Federal Rule of Civil Procedure 50(a) permits the Court to grant judgment as a matter of law against a party "[i]f a party has been fully heard on an issue during a jury trial and the court finds that a reasonable jury would not have a legally sufficient evidentiary basis to find for the party on that issue." Fed. R. Civ. P. 50(a). Rule 50(b) allows a party to renew a motion for judgment as a matter of law after trial, if filed no later than 28 days after entry of judgment. Fed. R. Civ. P. 50(b).

Courts should grant judgment as a matter of law only "if the evidence is so overwhelmingly in favor of the moving party that a reasonable jury could not arrive at a contrary verdict." Middlebrooks v. Hillcrest Foods, Inc., 256 F.3d 1241, 1246 (11th Cir. 2001). The Court must "consider[] the

evidence and the reasonable inferences drawn from it in the light most favorable to the nonmoving party." Id.

Stated another way, "a court should render judgment as a matter of law when there is no legally sufficient evidentiary basis for a reasonable jury to find for that party on that issue." Cleveland v. Home Shopping Network, Inc., 369 F.3d 1189, 1192 (11th Cir. 2004). Further, in conducting a Rule 50 analysis, the Court must refrain from invading the province of the jury: "Credibility determinations, the weighing of the evidence, and the drawing of legitimate inferences from the facts are jury functions, not those of a judge." Id. at 1193 (internal quotations and citations omitted).

## III. Analysis

As the jury found that Plaintiffs established their prima facie case of disparate treatment, the Court need not address the portion of Plaintiffs' original Motion concerning their prima facie case. (Doc. # 100 at 2-4). Instead, the Court will focus on the arguments concerning the BFOQ defense raised in the original Motion and the Renewed Motion.

Under Title VII, it is "an unlawful employment practice for an employer . . . to discharge any individual, or otherwise to discriminate against any individual with respect

to [her] compensation, terms, conditions, or privileges of employment, because of such individual's . . . sex." 42 U.S.C. § 2000e-2(a)(1). However, "an employer may discriminate on the basis of . . . sex . . . in those certain instances where . . . sex . . . is a bona fide occupational qualification reasonably necessary to the normal operation of that particular business or enterprise." Int'l Union, United Auto., Aerospace & Agr. Implement Workers of Am., UAW v. Johnson Controls, Inc., 499 U.S. 187, 200 (1991) (quoting 42 U.S.C. § 2000e-2(e)). The BFOQ exception recognizes that "classifications based on . . . sex . . . may sometimes serve as a necessary proxy for [a] neutral [job] qualification[] essential to the employer's business." W. Air Lines, Inc. v. Criswell, 472 U.S. 400, 411 (1985).

"The BFOQ defense has been construed very narrowly to apply 'only when the *essence* of the business operation would be undermined by not hiring members of one sex exclusively.'" Garrett v. Okaloosa Cnty., 734 F.2d 621, 624 (11th Cir. 1984) (quoting Diaz v. Pan Am. World Airways, 442 F.2d 385, 388 (5th Cir. 1971)); see also Int'l Union, United Auto., Aerospace & Agr. Implement Workers of Am., UAW, 499 U.S. at 201 ("The BFOQ defense is written narrowly, and this Court has read it narrowly."). "At bottom, to establish a BFOQ

5

defense, the Defendant must satisfy two elements. The Defendant must show that: (1) the sex-based qualification sufficiently 'relate[s] to [the] ability to perform [a] dut[y] of the job,' and (2) the particular duty goes to the essence of the Defendant's business." Berry v. Great Am. Dream Inc., 88 F. Supp. 3d 1378, 1380 (N.D. Ga. 2015) (quoting Int'l Union, United Auto., Aerospace & Agr. Implement Workers of Am., UAW, 499 U.S. at 204)).

Plaintiffs argue that "[t]he jury did not have sufficient evidence to conclude that Defendant's designation of three female-only night shift slots was reasonably necessary to its business operations; or that Defendant had no way to rearrange work assignments to avoid a clash between travelers' privacy interests and its employees' Title VII rights." (Doc. # 113 at 11). Plaintiffs insist that the Assistant Port Director Robert Diaz failed to consider or implement "two viable alternatives" to the discriminatory female-only assignments: (1) "'occasionally seeking assistance from female non-CBPOs, as the Personal Search Handbook instructs' if two female CBPOs were not available for the personal search of a female traveler," and (2) "paying 'overtime to female CBPOs who it would call in to perform or witness patdowns of female passengers between 2:00 PM and

6

11:00 PM on the rare occasions that such a need arose.'" (<u>Id.</u> at 3, 7). The Court disagrees.

The Court is mindful that it must "consider[] the evidence and the reasonable inferences drawn from it in the light most favorable to the nonmoving party." <u>Middlebrooks</u>, 256 F.3d at 1246. Taking the evidence in the light most favorable to Defendant, there was sufficient evidence presented at trial for a reasonable jury to conclude that Defendant had established its BFOQ affirmative defense.

As an initial matter, the Court notes that the parties dispute the exact legal requirements of the BFOQ defense in the Eleventh Circuit; specifically, whether proof that no reasonable alternatives to the challenged discriminatory policy exist is a required element. (Doc. # 113 at 1-3; Doc. # 114 at 2-3). True, neither the Supreme Court nor the Eleventh Circuit has explicitly held that an element of the BFOQ defense is that alternatives to a discriminatory policy were "not viable." While the Ninth Circuit may have held as much, this Court is not in the Ninth Circuit. See <u>Ambat v. City & Cnty. of San Francisco</u>, 757 F.3d 1017, 1025 (9th Cir. 2014) ("We also recognized that it would be impossible to prove a BFOQ defense without 'demonstrat[ing] that . . . alternative approaches . . . are not viable.'" (citation

7

omitted)). Rather, the Court's instructions to the jury were modeled on the discussion of the BFOQ defense in Hardin v. Stynchcomb, 691 F.2d 1364 (11th Cir. 1982). See (Doc. # 105 at 11) (outlining the elements of the BFOQ affirmative defense). This is not to say that the existence of alternatives to the discriminatory policy is not an important consideration under Eleventh Circuit law. Indeed, based on the language of Hardin, the relevant jury instruction included the requirement that: "Because of the nature of the operation of the Port of Tampa, Defendant could not rearrange job responsibilities in a way that would eliminate the clash between the privacy interests of female travelers and the employment opportunities of male and female CBPOs." (Id.); see also Hardin, 691 F.2d at 1370–71 ("In addition, defendants bear the burden of proving that because of the nature of the operation of the business they could not rearrange job responsibilities in a way that would eliminate the clash between the privacy interests of the inmates and the employment opportunities of female deputy sheriffs.").

The Court need not resolve the dispute over whether Hardin's language creates a separate element of the BFOQ defense or whether it just elaborates on a consideration under the "reasonably necessary" element of the BFOQ defense.

8

Regardless, there was sufficient evidence for a reasonable jury to conclude that there were no reasonable alternatives to the policy Defendant adopted. Thus, the female-only assignments were a BFOQ.

There was sufficient evidence for the jury to conclude that it would not have been a reasonable alternative for female non-CBPOs to perform or witness personal searches on female passengers. Among other evidence, the jury heard the testimony of Assistant Port Director Robert Diaz. He testified about his review of Port of Tampa data from 2016 and 2017 — before the female-only assignments were instituted. According to Diaz, searches of female passengers were sometimes being performed or witnessed by male CBPOs against CBP policy and personal searches of female passengers were sometimes not performed when they should have been. (Doc. # 117 at 160-85; Doc. # 118 at 12-17).

Likewise, Kenneth Wetzel testified about the extensive training CBPOs (who are law enforcement officers) receive and which made CBPOs better qualified to conduct personal searches than other non-CBPO law enforcement officers or non-law enforcement CBP employees. (Id. at 102-05, 110-11, 125). Indeed, Mr. Wetzel testified it was "a fair statement" that "[a] CBPO may not rely on someone who is not a CBPO because

9

they don't know of their training." (Id. at 125). Similarly, Guillermo Barragan, a watch commander for the Port of San Diego, testified in relevant part as follows:

> **Q. Does CBP management have a responsibility to ensure each port is staffed accordingly to carry out CBP's mission?**
>
> **A. Absolutely.**
>
> **Q. Are personal searches part of a CBPO's job?**
>
> **A. Yes, sir.**
>
> **Q. Are personal searches necessary for CBP to carry out its mission?**
>
> **A. Yes, sir.**
>
> Q. In your experience, do CBPOs at the Port of San Diego use agricultural specialists to assist with personal searches?
>
> A. Not that I'm aware of.
>
> Q. Why not?
>
> A. Because they're not trained to conduct pat-downs. It's not part of their training.
>
> Q. In your experience, do CBPOs at the Port of San Diego use local law enforcement to assist with personal searches?
>
> A. Not that I'm aware of.
>
> Q. Why not?
>
> A. Because they don't know our policy and procedures. They weren't trained by the CBP.
>
> Q. In your experience, do CBPOs at the Port of San Diego use TSA to assist with personal searches?

10

> A. No, sir.
>
> Q. Why not?
>
> A. I would say the same reason.
>
> Q. In your experience, does CBPOs at the Port of San Diego use members of the public to assist with personal searches?
>
> A. Absolutely not.
>
> Q. Why not?
>
> A. Because they don't know. There are policy and procedures that they wouldn't know what to look for or what would be a violation.
>
> Q. Would that include airline representatives?
>
> A. That would include them.
>
> **Q. In your experience, is a CBPO the best qualified person to conduct a personal search?**
>
> **A. Yes.**
>
> **Q. In your experience is a CBPO the best qualified witness to witness a personal search?**
>
> **A. Yes.**

(Id. at 42-43) (emphasis added).

Plaintiff Tracy Anderson additionally testified that, even though she had been working as a CBP agricultural specialist (a non-law enforcement position), she was required to undergo 16 to 18 weeks of additional training to become a CBPO. (Doc. # 116 at 107). The existence of this additional training supports that female CBPOs are the best qualified

11

officers to perform personal searches of female passengers in accordance with the CBP's specific search procedures. The jury also heard about the special nature of the border search exception under which CBP searches are performed (Doc. # 117 at 108-11; Doc. # 119 at 38), further highlighting the important role of CBPOs and their responsibilities to enforce federal law at the border.

As Defendant persuasively put it, "[a] jury can and did conclude that it was not reasonable to routinely rely on assistance from other female law enforcement personnel or even members of the public who were compelled to assist under force of criminal prosecution or a $1000 fine when female CBPOs could be designated on evening shifts to handle personal searches as they arose." (Doc. # 114 at 6); see also 19 U.S.C. § 507(a)(2) ("Every customs officer shall . . . have the authority to demand the assistance of any person in making any arrest, search, or seizure authorized by any law enforced or administered by customs officers, if such assistance may be necessary. If a person, without reasonable excuse, neglects or refuses to assist a customs officer upon proper demand . . ., such person is guilty of a misdemeanor and subject to a fine of not more than $1,000."). In short, while there was evidence that CBPOs were authorized to use female

12

non-CBPOs to perform or witness searches when a female CBPO was unavailable, there was sufficient evidence for the jury to conclude that relying on female non-CBPOs was not a viable policy for ensuring that CBP's mission was fulfilled.

Furthermore, there was sufficient evidence for the jury to conclude that it would not have been a reasonable alternative for female CBPOs to be called in on overtime whenever a personal search of a female passenger needed to be conducted at night. Importantly, the Court took judicial notice of 19 C.F.R. § 24.16, which states in relevant part: "All work assignments should be made in a manner which minimizes the cost [of overtime] to the government or party in interest. Decisions, including, but not limited to, what hours should be covered by a tour of duty or whether an assignment should be treated as a continuous assignment or subject to commute compensation, should be based on least cost considerations." 19 C.F.R. § 24.16(d)(2). Assistant Port Director Diaz testified that, in 2016 and 2017, overtime was being paid for personal searches performed during regular hours when CBPOs should have been assigned to work at the Port of Tampa. (Doc. # 118 at 19-38). The jury reasonably could have shared Mr. Diaz's belief that paying female CBPOs overtime to perform personal searches of female passengers on

13

the night shift was a violation of this "least cost" principle. The jury also reasonably could have concluded that an overtime call-list for female CBPOs would not have been effective, given that female CBPOs may have failed to answer calls, or may have taken too long to come into the airport to conduct a personal search when needed, and CBPOs were subject to a cap on how much overtime they could perform. (Doc. # 117 at 40-41, 55-56; Doc. # 118 at 33-36). These are common-sense issues that the jury was able to weigh in making their decision on the reasonableness of alternatives to the female-only assignments.

While Plaintiffs emphasize that the jury submitted a question relating to overtime, a night shift call list, and the third element of the BFOQ defense (Doc. # 113 at 10), the existence of this question does not support that the jury lacked evidence to make its BFOQ determination. On the contrary, the jury seriously considered the issue of whether Defendant could have "rearranged job responsibilities in a way that would eliminate the clash between the privacy interests of female travelers and the employment opportunities of male and female CBPOs," and were concerned with alternatives to the female-only assignments. (Doc. # 110 at 6). After considering this issue, the jury ruled in favor

of Defendant, finding that Defendant could not have rearranged job responsibilities to eliminate the clash. (Doc. # 106 at 3).

Finally, Plaintiffs argued at the end of their original Motion for Judgment as a Matter of Law that there was insufficient evidence "that Defendant had any factual basis to believe that male CBPOs [] could not safely and efficiently perform the duties of the designated female-only shifts." (Doc. # 100 at 7). Plaintiffs failed to raise this argument again in their Renewed Motion (Doc. # 113); thus, this argument is waived.

However, even if this argument were not waived, it would fail. In their summary judgment briefing and at trial, Plaintiffs did not dispute that only females should perform personal searches on female passengers. See (Doc. # 119 at 28) (stating during Plaintiffs' closing argument that "[f]or element 2 [of the BFOQ defense] it is clear that, yes, the policy states that male CBPOs cannot search females" and that Defendant "would be able to meet element 2"); see also (Doc. # 53 at 1-2) ("[This case] is not about the validity of CBP's policy requiring females to perform and witness searches of females. For purposes of this case, Plaintiffs assume that this requirement is justified."). With good reason: Congress

15

has explicitly "authorized" Defendant "to employ female inspectors for the examination and search of persons of their own sex." 19 U.S.C. § 1582. In accordance with this, the CBP Personal Search Handbook provides that a CBPO "conducting a personal search or witnessing a medical examination must be of the same gender as the person being searched, except when the officer conducts an immediate patdown for officer safety." (Doc. # 52-6 at 3). Thus, to the extent Plaintiffs are now arguing that Defendant has failed to show that male CBPOs could not safely and efficiently perform the searches of female passengers needed on the night shift, that argument fails. The jury had sufficient evidence at trial to make this determination in Defendant's favor.

In short, both Plaintiffs and Defendant presented testimony and evidence they believed supported their respective positions at trial. While Plaintiffs still feel that their evidence was superior to Defendant's, there was sufficient evidence for the jury to find in favor of Defendant on the BFOQ defense. Thus, the Court will not set aside the jury's verdict. At this time, it is appropriate for the Clerk to enter judgment in favor of Defendant and close this case.

Accordingly, it is now

**ORDERED, ADJUDGED,** and **DECREED:**

(1) Plaintiffs Tracy R. Anderson, Mauricio Guerrero, Sageline Laurent, Rebecca Morales, and Jeffrey S. Thomas's Motion for Judgment as a Matter of Law (Doc. # 100) and Renewed Motion for Judgment as a Matter of Law under Rule 50(b) (Doc. # 113) are **DENIED**.

(2) In accordance with the jury verdict (Doc. # 106), the Clerk is directed to enter judgment in favor of Defendant Alejandro Mayorkas and against Plaintiffs Tracy R. Anderson, Mauricio Guerrero, Sageline Laurent, Rebecca Morales, and Jeffrey S. Thomas.

(3) Thereafter, the Clerk is directed to **CLOSE** this case.

**DONE** and **ORDERED** in Chambers in Tampa, Florida, this 22nd day of January, 2025.

_____
VIRGINIA M. HERNANDEZ COVINGTON
UNITED STATES DISTRICT JUDGE